1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ALLISON BARTON, individually and on behalf of others similarly situated,

Plaintiff,

v.

KIMBERLY-CLARK CORPORATION,

Defendant.

Case No. 3:24-CV-01337-GPC-KSC

**ORDER DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS**

**[ECF No. 11]**

Plaintiff brought several consumer protection claims against Defendant for allegedly misleading consumers about the presence of lead in Defendant's tampon products.

Before the Court is Defendant's motion to dismiss the complaint. ECF No. 11. Plaintiff filed an opposition, and Defendant filed a reply. ECF Nos. 14, 15. Based on the reasons below, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss.

## BACKGROUND

Plaintiff Allison Barton ("Plaintiff") has sued Defendant Kimberly-Clark Corporation ("Defendant") for allegedly violating California consumer protection law

1

regarding its U by KOTEX Click compact tampons (the "Products").  ECF No. 8, First Amended Complaint ("Complaint" or "FAC") ¶ 1.  Plaintiff alleges that Defendant failed to disclose, and materially omitted, that these Products contain lead.  *Id*.

**A. Lead in tampons**

According to Plaintiff, the World Health Organization states that "[t]here is no level of exposure to lead that is known to be without harmful effects" and that "[e]xposure to lead can affect multiple body systems and is particularly harmful to young children and women of child-bearing age."  FAC ¶¶ 7, 34.  Citing to an article published in a scientific toxicology journal, Plaintiff alleges that lead can lead to "severe health risks and toxicity, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, coma and death."  *Id*. ¶ 25.

The Complaint states that California's Proposition 65 establishes a Maximum Allowable Dose Level ("MADL") of 0.5 micrograms of lead per day for reproductive toxicity.  *Id*. ¶ 35.   Based on "independent scientific testing and analysis of the Products," the ordinary and expected use of the Products would allegedly expose consumers to more than this MADL per day.  *Id*. ¶ 3.  Specifically, Plaintiff alleges that her independent laboratory testing shows that the Products contain .189 micrograms of lead per gram of Product.  *Id*. ¶ 36.  The testing was done on the regular version of the Product line.  *Id*. n.13.  Products are sold in varying sizes, with different gram weights, and Plaintiff has extrapolated the testing result from the regular Product to the super and super plus Products.  *See id*.  Plaintiff alleges that, based on the daily average use of tampons, consumers are exposed to lead in excess of the MADL, regardless of what size Product they use.  *Id*. ¶¶ 37, 38; *see id*. ¶¶ 44-55 (detailing how typical use of each Product, regardless of size, would expose consumers to a level of lead that exceeds the MADL).

Plaintiff alleges that this exposure to lead is "particularly detrimental" because the Products are "inserted vaginally where the lead can be directly absorbed into the blood stream." *Id*. ¶¶ 26-33 (detailing how toxins can enter the blood stream directly through vaginal administration).

**B. Alleged misrepresentations and omissions**

According to Plaintiff, the Products contain the following messaging ("Representations") on their boxes: (i) "no harsh ingredients"; (ii) "elemental chlorine-free rayon"; (iii) "pesticide free"; (iv) "made without fragrance"; (v) "gynecologist tested"; and (vi) "BPA free." *Id*. ¶ 81.

Plaintiff alleges that these Representations mislead reasonable consumers to believe that the Products are safe to use, including that "they are free from potentially harmful elements and ingredients." *Id*. ¶ 82. According to Plaintiff, a reasonable consumer could believe, based on these Representations, that the Products would be free from lead. *Id*. ¶¶ 18-20.

Plaintiff alleges that these Representations and the failure to disclose the presence of lead in Defendant's Products constitute a violation of California consumer protection law. *Id*. ¶ 1. Plaintiff asserts that Defendant knew, or should have known, that the Products contained lead and either willfully or intentionally failed to disclose this fact to consumers. *Id*. ¶ 70. Plaintiff also asserts that Defendant owed consumers a duty of care to adequately test its Products for heavy metals and if found, to remediate or disclose their presence. *Id*. ¶ 71.

**C. Plaintiff's injury and causes of action**

Plaintiff allegedly bought the Products, in regular and super-size, several times, without knowing that the Products contained lead. *Id*. ¶¶ 96, 105. She relied on the Representations in believing that the Products would be free from harmful effects and safe to use, but had she known that the Products contained lead, she would not have

24-CV-01337-GPC-KSC

bought them.  *Id*. ¶¶ 104, 107.  Since consumers were "deprived of making the informed choice between the Products and other menstrual products [that do not contain lead]," *id*. ¶ 76, Plaintiff alleges that she and other consumers have suffered economic injury based on the purchase price of the Products.  *Id*. ¶ 77.

Plaintiff continues to suffer harm because she cannot rely on the labeling of the Products and is unable to determine whether to buy them in the future, even though she would like to purchase them if they do not contain lead.  *Id*. ¶ 110.  Unless Defendant is enjoined from failing to disclose the presence of lead in the future, Plaintiff will not be able to determine if there is lead or not in the Products.  *Id*. ¶ 111.  Thus, Plaintiff alleges that the legal remedies are inadequate to prevent future injuries.  *Id*. ¶ 112.

Plaintiff seeks to represent a Class against Defendant for violations of state consumer protection law: (1) Unfair Competition Law ("UCL"), California Business & Professions Code sections 17200 *et seq.*; (2) False Advertising Law ("FAL"), California Business & Professions Code sections 17500 *et seq.*; and (3) Consumers Legal Remedies Act ("CLRA"), California Civil Code sections 1750 *et seq*.  *Id*. at 18-24.

Defendant moves to dismiss the complaint on various grounds.  ECF No. 11 ("Mot.").  For the reasons below, the Court GRANTS in part and DENIES in part this motion to dismiss.

## LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.  *See Balistreri v. Pacifica Police Dep't*., 901 F.2d 696, 699 (9th Cir. 1990); *Robertson v. Dean Witter Reynolds, Inc*., 749 F.2d 530, 534 (9th Cir. 1984).  To survive a motion to dismiss, the complaint must contain a "short

and plain statement showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), backed by sufficient facts that make the claim "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Rather, it demands enough factual content for the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

In reviewing the plausibility of a complaint, courts must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But courts do not accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Ultimately, the court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

**B. Federal Rule of Civil Procedure 9(b)**

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires a plaintiff bringing such a claim to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The circumstances required by Rule 9(b) are the "who, what, when, where, and how" of the fraudulent activity.  *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).  In addition, the allegation "must set forth what is false or misleading about a statement, and why it is false." *Id*.  The purpose of Rule 9(b) is to require that allegations be "specific enough to give defendants notice of the particular misconduct which is alleged ... so that they can defend against the charge and not just

1   deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764

2   (9th Cir. 2007).

3   **C. Leave to amend**

4       When a court dismisses a complaint, it "should grant leave to amend... unless it

5   determines that the pleading could not possibly be cured by the allegation of other facts."

6   *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). The court considers factors such as

7   "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to

8   cure deficiencies by previous amendments, undue prejudice to the opposing party[,] and

9   futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d

10  531, 538 (9th Cir. 1989) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Dismissal

11  without leave to amend is proper only if it is clear that "the complaint could not be saved

12  by any amendment." *Intri-Plex Techs. v. Crest Group, Inc*., 499 F.3d 1048, 1056 (9th

13  Cir. 2007).

14                                  **DISCUSSION**

15  **A. Judicial notice**

16      Generally, on a motion to dismiss, courts will limit their review to the contents of

17  the complaint and may only consider extrinsic evidence that is properly presented as part

18  of the complaint.  *See Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001).

19  However, under the incorporation-by-reference doctrine, courts can consider documents

20  that were not attached to a pleading.  *See Davis v. HSBC Bank Nev., N.A.,* 691 F.3d 1152,

21  1160 (9th Cir. 2012) (citation omitted).  And under Federal Rule of Evidence 201, a

22  district court may take notice of facts not subject to reasonable dispute that are capable of

23  accurate and ready determination by resort to sources whose accuracy cannot reasonably

24  be questioned.  Fed. R. Evid. 201(b).

25      Defendant seeks incorporation-by-reference or judicial notice of three exhibits: a

26  copy of the article cited in the Complaint paragraph 27, footnote 5, authored by

27

28

6

1   Shearston, et al. (Ex. 1); a copy of the announcement published by the U.S. Food & Drug

2   Administration ("FDA") regarding the agency's investigation of lead in tampons (Ex. 2);

3   and a copy of the 501(k) Premarket Notification for Defendant's tampons, also on FDA's

4   website (Ex. 3).  ECF No. 12 (Request for Judicial Notice).

5       The Court incorporates by reference Exhibit 1 because it is relevant to the instant

6   case, neither party questions their authenticity, and Plaintiff's Complaint references and

7   relies on this article to support its allegations.  *See* FAC ¶¶ 27, 32.

8       The Court takes judicial notice of Exhibits 2 and 3 because they are on webpages

9   published by the government and are relevant to the issues at hand, and neither party

10  disputes its authenticity.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99

11  (9th Cir. 2010).  But the Court will not take judicial notice of the truth of any disputed

12  facts contained in these exhibits.  *See Lee*, 250 F.3d at 689.

13      Defendant submitted a Notice of Supplemental Authority with two exhibits

14  attached: the FDA's announcement on December 23, 2024 that it had completed the

15  literature review portion of its investigation into tampons (Exhibit 1) and the actual report

16  containing the literature review (Exhibit 2).  ECF No. 20.  The Court takes judicial notice

17  of the Notice of Supplemental Authority, Exhibits 1 and 2 because both are "made

18  publicly available by government entities" and "neither party disputes the authenticity of

19  the web sites or the accuracy of the information displayed therein."  *Daniels-Hall v. Nat'l*

20  *Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010).

21  **B. Intrusion on FDA's role**

22      1. Preemption

23      Federal preemption is invoked when "(1) Congress enacts a statute that explicitly

24  preempts state law; (2) state law actually conflicts with federal law; or (3) federal law

25  occupies a legislative field to such an extent that it is reasonable to conclude that

26

27                                            7

28                                                          24-CV-01337-GPC-KSC

1  Congress left no room for state regulation in that field." *Chae v. SLM Corp*., 593 F.3d

2  936, 941 (9th Cir. 2010).

3      In light of the tumultuous and tortious regulatory landscape in the 1960s and

4  1950s, the Medical Device Amendment of 1976 ("MDA"), 21 U.S.C. § 360c *et seq*., was

5  passed and "imposed a regime of detailed federal oversight." *Riegel v. Medtronic, Inc*.,

6  552 U.S. 312, 315 (2008) (describing the history of the MDA).  The MDA has an express

7  preemption provision which states no State may establish "any requirement which is

8  different from, or in addition to, any requirement applicable under this chapter to the

9  device, and which relates to the safety and effectiveness of the device…"  21 U.S.C. §

10  360k(a).

11      According to Defendant, preemption applies here because the Plaintiff is

12  "attack[ing] the adequacy of the label notwithstanding the FDA's guidance."  Mot. at 8.

13  Defendant argues that Plaintiff seeks to impose lead-based disclosures that would amount

14  to "co-opting state law to add labeling requirements that are both 'different from' and 'in

15  addition to' the FDA's."  *Id*. (citing 21 C.F.R. § 808.1(d)).

16      Plaintiff, in turn, argues that the Representations at issue are "voluntary advertising

17  statements," Opposition at 3, that are "not governed by any government or FDA

18  regulation or requirement," *id*. (citing to FAC ¶¶ 84-85).  Plaintiff is not challenging any

19  FDA-mandated label statement.  For tampons, the FDA only requires label statements

20  about Toxic Shock Syndrome ("TSS") and tampon absorbency.  *See* 21 C.F.R. §

21  801.430(c)-(e).  Plaintiff does not challenge these FDA requirements, and instead only

22  targets Defendant's voluntary Representations designed to "appeal to consumers and

23  increase sales of the Products."  FAC ¶ 86.

24      The analysis turns on what "different from, or in addition to" actually means.  In

25  21 C.F.R. § 808.1(d), the FDA interprets the preemption provision to mean that State and

26  local requirements are preempted "only when the Food and Drug Administration has

27

28

24-CV-01337-GPC-KSC

established *specific* counterpart regulations or there are other *specific* requirements applicable to a *particular* device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the *specific* Food and Drug Administration requirements." *Papike v. Tambrands Inc*., 107 F.3d 737, 740 (9th Cir. 1997) (emphasis in original). In other words, to consider a State or local requirement as being "in addition to" an FDA regulation, the State or local requirements must be, at a minimum, related to the specific regulation.

In *Papike*, a plaintiff who contracted TSS brought a state tort law claim against a tampon company for failure-to-warn about TSS. The Ninth Circuit found that her claim was preempted by the MDA. But unlike the Plaintiff in this case, the *Papike* plaintiff was directly challenging the sufficiency of the tampon company's TSS warnings, arguing that federal requirements were not enough. *Papike*, 107 F.3d at 740-42. Here, Plaintiff is not asking for any additional or different disclosures related to the *specific* regulation of TSS and absorbency. Plaintiff's allegations do not deal with TSS at all. And in *Perez*, the plaintiff sought a disclosure requirement that was "in addition to" the federal requirements because it would mandate medical providers to affirmatively tell patients when lasers have not been approved by the FDA for a certain use. *Perez v. Nidek Co*., Ltd., 711 F.3d 1109, 1119-1120 (9th Cir. 2013). Again, the disclosure sought by the plaintiff was directly related to the FDA's specific regulations on lasers: that medical providers would need to disclose what was *not* covered by these FDA regulations.

Since Plaintiff is not asking for additional labeling requirements that would conflict with, or even relate to, the specific requirements set by the FDA, the Court finds there is no federal preemption here. *Cf. Souter v. Edgewell Pers. Care Co*., 542 F. Supp. 3d 1083, 1097 (S.D. Cal. 2021) ("The FDCA is not focused on the truth or falsity of advertising claims…")

    2. <u>Primary jurisdiction</u>

9

24-CV-01337-GPC-KSC

1      In June 2024, researchers published a study which found "measurable
2  concentrations" of lead "in 30 tampons produced by 14 tampon brand manufacturers.
3  Request for Judicial Notice, Ex. 1 at 2, Environmental International 190 (2024) 108849,
4  Tampons as a source of exposure to metal(loids)s, Jenni A. Shearson, et al.  The study's
5  conclusion observed that "[f]uture research is necessary to replicate our findings and
6  determine whether metals can leach out of tampons and cross the vaginal epithelium into
7  systemic circulation." *Id*. at 9.  In response, on September 10, 2024, the FDA announced
8  that it commissioned an independent literature review and initiated an internal bench
9  laboratory study to determine if metals from tampons are released and if they are
10  absorbed by the body.  Request for Judicial Notice, Ex. 2, Biocompatibility and
11  Toxicology Program: Research on Medical Devices, Biocompatibility, and Toxicology.
12  The study will, among other things, measure the amount of metals that come out of
13  tampons under conditions that more closely mimic normal use.

14      On December 23, 2024, the FDA announced that it had completed the literature
15  review portion of its investigation and that "the findings did not identify safety concerns
16  associated with tampon use and contaminant exposure."  Notice of Supplemental
17  Authority, Exhibit 1, at 1.  Despite the "limitations related to the methods used in the
18  [reviewed] studies" and the fact that none of the studies actually addressed "how much, if
19  any, of the contaminants identified are released from the tampon or absorbed through the
20  vagina," the FDA stated that it "continues to recommend FDA-cleared tampons as a safe
21  option for use as a menstrual product."  *Id.*

22      Based upon the completed literature review and the pending laboratory study,
23  Defendant, under the doctrine of primary jurisdiction, moves the Court to dismiss the
24  Complaint or, in the alternative, stay the proceedings, in order to permit the FDA to
25  complete its risk assessment study and report their findings.  Mot. at 10-11.

26
27
28

24-CV-01337-GPC-KSC

The doctrine of primary jurisdiction applies in a "limited set of circumstances." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). It allows courts, in their discretion, to stay proceedings, or dismiss a complaint without prejudice, until the "resolution of an issue within the special competence of an administrative agency." *Id*. The policy behind the doctrine is prudential: it applies if the court determines that "an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Id*.

Courts, in determining whether the doctrine applies, look at "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002). Courts "must also consider whether invoking primary jurisdiction would needlessly delay the resolution of claims" because in the Ninth Circuit, "efficiency is the deciding factor in whether to invoke primary jurisdiction." *Astiana v. Hain Celestial Grp.*, 783 F.3d 753, 760 (9th Cir. 2015).

In particular, at the motion to dismiss stage, courts must "apply a standard derived from Rule 12(b)(6) jurisprudence: whether the complaint plausibly asserts a claim that would *not* implicate the [primary jurisdiction] doctrine." *Cnty. of Santa Clara v. Astra U.S.*, 588 F.3d 1237, 1251–52 (9th Cir. 2009), *rev'd on other grounds*, 563 U.S. 110 (not invoking primary jurisdiction where, without the agency's expertise, the court could plausibly adjudicate the action) (emphasis in original).

Defendant argues that because the FDA has publicly announced its intention to study and publish the scientific issue at the heart of the lawsuit (i.e., what health risks, if

24-CV-01337-GPC-KSC

1   any, exist from the potential presence of heavy metals like lead in tampons), the doctrine

2   of primary jurisdiction applies.  *See* Mot. at 10.

3        It is true that the FDA regulates tampons as Class II medical devices.  *See* 21

4   C.F.R. §§ 884.5460, 884.5470.  And mere months after Plaintiff filed her Complaint, the

5   FDA indicated that it was "aware of concerns about tampon safety after a 2024 study

6   found metals in tampons during laboratory testing."  Request for Judicial Notice, Ex. 2.

7   The FDA emphasized that this June 2024 study "did not test whether metals are released

8   from tampons when used" and did not test for metals being "absorbed into the vaginal

9   lining."  *Id*.  The FDA later completed its literature review of nine published studies and

10  announced that its laboratory study was underway to determine if tampons release the

11  metals they contain and whether these metals are vaginally absorbed.  Notice of

12  Supplemental Authority, Exhibit 1.  Based on all this, Defendant argues that the Court

13  should invoke the doctrine of primary jurisdiction.

14       Ultimately, in considering primary jurisdiction, the Court focuses on the specific

15  issues raised by the claims.  Although the FDA has a history of regulating tampons, the

16  primary jurisdiction doctrine does not "require[ ] that all claims within an agency's

17  purview... be decided by the agency."  *Brown v. MCI WorldCom Network Servs., Inc*.,

18  277 F.3d 1166, 1172 (9th Cir. 2002).  In exercising its discretion, the Court considers

19  whether the issues raised in the instant case line up with the expertise of the FDA and

20  their ability to resolve the issues before the Court.  Here, Plaintiff is proceeding on two

21  theories.  First, she claims that Defendant made misrepresentations in the Product's

22  packaging and that a reasonable consumer would be deceived by those

23  misrepresentations.  Second, Plaintiff is asserting a fraudulent omission theory that

24  requires a showing of an unreasonable safety hazard.

25       As to the misrepresentation theory, Plaintiff argues that Products and their

26  Representations are *misleading*, which is "not a technical area in which the FDA [has]

27

28

24-CV-01337-GPC-KSC

greater technical expertise than the courts." *Lockwood v. Conagra Foods, Inc*., 597 F. Supp. 2d 1028, 1035 (N.D. Cal. 2009); *see Jones v. ConAgra Foods, Inc.*, 912 F. Supp. 2d 889, 899 (N.D. Cal. 2012) ("allegations of deceptive labeling do not require the expertise of the FDA to be resolved in the courts, as every day courts decide whether conduct is misleading"). The FDA's literature review did not, and the FDA's laboratory study will not, review affirmative representations such as those on the Product packaging and determine whether they were misleading when Defendant omitted the presence of lead in the tampons. This issue "do[es] not clearly require the FDA's expertise or benefit from uniformity in administration." *Sciortino v. Pepsico, Inc.,* 108 F. Supp. 3d 780, 814 (N.D. Cal. 2015). As such, the FDA decision will not resolve the issue raised in the misrepresentation claim and primary jurisdiction does not apply to it. *See In re Trader Joe's Co. Dark Chocolate Litig*., 2024 WL 1319725, at *15 (S.D. Cal. Mar. 27, 2024) ("[c]ases concerning dark chocolate bar labeling may be on the rise of late, but cases challenging food product labels are not an issue of first impression").

As to the unreasonable safety risk that makes up part of the fraudulent omission claim, the June 2024 study observes that "no previous studies have measured metals in tampons," Request for Judicial Notice, Ex. 2 at 1. While there is no question that vaginal walls are permeable and permit direct access to networks of blood vessels, it is currently unknown whether the lead in tampons leeches out of the product and enters the circulatory system. The questions of whether lead is released from tampons, enters a woman's circulatory system and creates an unreasonable safety risk are issues of "first impression." These issues are within the jurisdiction of the FDA and would benefit from the FDA's expertise in determining the safety of consumer products.

However, there is no indication that the FDA will provide an opinion as to an unreasonable safety risk created by any particular tampon, let alone for Defendant's Product. In addition, Defendant does not address the delay that would likely result if this

24-CV-01337-GPC-KSC

1    case were stayed until the FDA issued guidance.  The FDA only stated that it would

2    publicly communicate its laboratory findings after peer review; it gave no indication or

3    timeline of when that would be.  *See* Request for Judicial Notice, Ex. 3.  "[P]rimary

4    jurisdiction is not required when a referral to the agency would significantly postpone a

5    ruling that a court is otherwise competent to make."  *Astiana*, 783 F.3d at 761.  Waiting

6    for this guidance may simply delay Plaintiff's claims with no actual pay-off in the end.

7    *See In re Plum Baby Food Litig.*, 2022 WL 16640802, at *1 (N.D. Cal. Jan. 12, 2022)

8    ("[U]ncertainty over how and when the FDA will act counsels against an indefinite

9    stay.")  Finally, given that there is no basis to stay the misrepresentation claim, it would

10   be inefficient for the Court to sever the safety issues related to the fraudulent omission

11   claim, and, as stated earlier, "efficiency is the deciding factor in whether to invoke

12   primary jurisdiction."  *Astiana*, 783 F.3d at 760.

13        Accordingly, the Court declines to apply the doctrine of primary jurisdiction to

14   either theory of liability.  Defendant's motion to dismiss Plaintiff's claims on this basis is

15   denied.

16   **C. Statutory standing**

17        Plaintiff's statutory claims require that Plaintiff actually experienced an economic

18   injury, in the form of "lost money or property as a result of the unfair competition."

19   *Sanchez v. Nurture, Inc.*, 626 F. Supp. 3d 1107, 1115 (N.D. Cal. 2022) (citing Cal. Bus.

20   & Prof. Code §§ 17204, 17535).

21        Defendant argues that Plaintiff invokes two theories of economic injury, the

22   "benefit of the bargain" theory and the "overpayment" theory, and fails to "connect the

23   dots" between her purchase and these theories of harm.  Mot. at 11.  Defendant argues

24   that "[w]ithout allegations that the tampons she purchased contained the same levels of

25   lead as those tested, Plaintiff fails to allege how she has statutory standing to sure over

26   the tampons that were tested, regardless of the theory advanced."  Mot. at 11.

27

28

1    According to Plaintiff, she asserts neither a "benefit of the bargain" injury or an

2    "overpayment injury" but rather that she would not have purchased the Products if she

3    knew that they contained lead.  *See* FAC ¶ 78.  This is an adequate injury-in-fact that

4    satisfies standing. *See Maya v. Centex Corp*., 658 F.3d 1060, 1069 (9th Cir. 2011)

5    (finding "quintessential injury-in-fact" when plaintiffs spent money that they would not

6    have spent "absent defendants' actions").

7    It does not matter that Plaintiff's *own* tampons were tested or not.  Again, the

8    injury is that Plaintiff paid money for the Products that she would not have if she knew

9    that Products contained lead, not that she was physically injured by lead in her own

10   tampons or that the tampons did not work as intended.  "Under California law, the

11   economic injury of paying a premium for a falsely advertised product is sufficient harm

12   to maintain a cause of action." *Davidson v. Kimberly-Clark*, 889 F.3d 956, 965 (9th Cir.

13   2018). The Court finds that Plaintiff has established standing based on economic injury.

14   **D. Sufficient pleading under Fed. R. Civ. P. 9(b)**

15   Because Plaintiff's claims "sound in fraud," they must satisfy the heightened

16   pleading requirements of Rule 9(b).  *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1125 (9th

17   Cir. 2009).  The Ninth Circuit has held that a claim is "grounded in fraud" for the

18   purposes of Rule 9(b) where "the plaintiff [ ] allege[s] a unified course of fraudulent

19   conduct and rel[ies] entirely on that course of conduct as the basis of a claim.".  *Vess v.

20   Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).  A plaintiff must allege

21   with particularity the "who, what, when, where, and how" of the misconduct charged, so

22   that defendants have notice and can defend against the particular misconduct.  *See*

23   *Kearns*, 567 F.3d at 1124.  The complaint must also state "what is false or misleading

24   about a statement, and why it is false."  *In re GlenFed, Inc. Sec. Litig*., 42 F.3d 1541,

25   1548 (9th Cir. 1994) (en banc*), superseded by statute on other grounds*, Private Sec.

26   Litig. Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1).

27

28

24-CV-01337-GPC-KSC

1    Here, Plaintiff's FAC claims rely entirely on the same course of alleged fraudulent

2    conduct: Defendant's misrepresentations that their products are safe when they contain

3    lead in such quantities that create an unreasonable safety hazard.  Accordingly, Plaintiff's

4    claims are subject to Rule 9(b)'s heightened pleading requirement.  *See, e.g., Loh v.*

5    *Future Motion, Inc*., No. 21-cv-06088-EJD, 2022 WL 2668380, at *5 (N.D. Cal. July 11,

6    2022) ("each claim is subject to the requirements of Rule 9(b)," including claims for

7    CLRA and unjust enrichment).

8    Defendant argues that the testing allegations in the Complaint are "too vague" and

9    "cursory."  Mot. at 14.  Defendant argues that "[a]t a minimum, Plaintiff must allege 'the

10   testing methodology followed,' the specific time of the testing, and the 'qualifications of

11   the testers.'"  *Id*. (citing *Trammel v. KLN Enters., Inc*., 2024 WL 4194794, at *5 (S.D.

12   Cal. Sept. 12, 2024)).  In other words, "how" and "why" the representations are false.

13   Plaintiff alleges that she bought specific Products produced by the Defendant, at a

14   specific time and stores, labeled with specific Representations, and that she believed the

15   Products to be lead-free when they were not.  However, Plaintiff is also required to

16   address "what is false or misleading about [the] statement, and why it is false."  *In re*

17   *GlenFed*, 42 F.3d at 1548.  As to the "what,", Plaintiff adequately alleges that the

18   packaging representations communicate to the consumer that the product is free of

19   ingredients that are harmful, which is false because the tampons contain lead.  But, as to

20   "why" and "how" the statement is false, this question implicates the testing performed

21   because the misrepresentations can only be false if there are facts supporting the presence

22   of lead in the Products purchased by Plaintiff.  Defendant argues that these testing

23   allegations fail to provide the details regarding the method of testing and why testing

24   results of a single type of tampon (regular) can be extrapolated to all Product types. Mot.

25   at 14-15.

26

27

28                                                                                      24-CV-01337-GPC-KSC

Here, Plaintiff alleges she purchased regular and super U by KOTEX Click tampons during the class period.  FAC ¶ 96.  In the Complaint, Plaintiff relies on unidentified independent testing which produced reported results for the regular Products.  FAC ¶ 36, n. 13.  The testing fails to analyze the super and super plus Products and, instead, Plaintiff relies on extrapolation from the regular Products without any explanation as to why extrapolation is appropriate.  The lack of testing of the super and super plus Products and the failure to provide support for extrapolation is made more salient given that the Complaint also alleges that L. brand and Tampax pure cotton tampons were tested and contained such a small amount of lead (if any) that the lead is below the limit of detection.  FAC ¶¶ 57-58.

While a plaintiff is not required to prove the merits of their case at the pleading stage, *see OSU Student Alliance v. Ray*, 699 F.3d 1053, 1077 (9th Cir. 2012) ("plaintiff's failure to prove the case on the pleadings does not warrant dismissal"), more than a conclusory claim that the product contains a harmful substance is required, *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice").  To plausibly allege a presence of harmful substance claim, Plaintiff is required to allege facts that testing disclosed presence of such substances in the accused product purchased.  *See Lowe v. Edgewell Pers. Care Co*., 711 F. Supp. 3d 1097 (N.D. Cal. 2024); *Krystofiak v. BellRing Brands, Inc*., 2024 WL 3012801, at *7 (N.D. Cal. June 14, 2024); *Hamman v. Cava Grp., Inc*., No. 22-CV-593-MMA (MSB), 2023 WL 3450654, at *5 (S.D. Cal. Feb. 8, 2023) (allegations relied on Consumer Reports article, similar studies and reports, and Plaintiff's own tests that the Products are likely to contain PFAS).  Extrapolation of test results can be applied broadly where supported by factual allegations.  *Cf. Onaka v. Shiseido Americas Corp*., 2023 WL 2663877, at *5 (S.D.N.Y. March 28, 2023).

24-CV-01337-GPC-KSC

1    The Court concludes that the FAC allegations as to the presence of lead fail to

2    provide sufficient detail regarding the testing.  The FAC merely alleges that independent

3    laboratory testing and analysis detected .189 mcg of lead per gram of Product.  The FAC

4    provides no further information as to the laboratory that performed the testing or the form

5    and date of testing.  Further, to the extent that Plaintiff has failed to test the super and

6    super plus Products purchased by Plaintiff, Plaintiff is required to either test these

7    Products or explain why extrapolation of the regular U by KOTEX Click results is

8    appropriate.

9    For the foregoing reasons, Plaintiff's claims fail to meet the heightened pleading

10    standard of Rule 9(b).  Because the deficiencies are ones that Plaintiff can correct, the

11    Court GRANTS the motion to dismiss without prejudice and provides leave to amend the

12    Complaint.

13    **E. UCL, FAL, and CLRA**

14    Assuming Plaintiff's FAC satisfies Rule 9(b), the Court will further analyze

15    Plaintiff's UCL, FAL, and CLRA claims based on Defendant's alleged fraudulent

16    omissions and misrepresentations.  The UCL prohibits business practices that are

17    "unlawful, unfair or fraudulent," Cal. Bus. & Prof. § 17200; the FAL prohibits the

18    dissemination of any advertising "which is untrue or misleading," Cal. Bus. & Prof. Code

19    § 17500; and the CLRA proscribes specific acts and practices in the sale of goods or

20    services to be unlawful, including making affirmative misrepresentations or omissions

21    regarding the "standard, quality or grade" of a particular good or service, Cal. Civ. Code

22    § 1770(a).

23    Here, Plaintiff's UCL, FAL and CLRA claims are premised on a theory of

24    misrepresentation that the Representations on the labels of the Products mislead

25    consumers to believe that the tampons are free of any "potentially harmful elements,"

26

27    18

28    24-CV-01337-GPC-KSC

including lead, FAC ¶ 82, and a material omission theory, alleging that Defendant failed to inform consumers that the tampons contain lead, *id.* ¶¶ 70-72, 106.

### 1. Actionable misrepresentation

To plausibly allege a UCL, FAL or CLRA claim based upon misrepresentation, plaintiffs "must allege that they relied on a misrepresentation and suffered injury as a result." *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1092 (1993). Claims under these statutes are governed by the "reasonable consumer" standard, which means that plaintiffs must "show that members of the public are likely to be deceived" by the defendant's marketing claims. *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 777 (9th Cir. 2024) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)). These claims can be false, *or* true but "either actually misleading… or has a capacity, likelihood, or tendency to deceive or confuse the public." *Salazar v. Walmart, Inc.*, 83 Cal. App. 5th 561, 566 (Cal. Ct. App. 2022). This "reasonable consumer" standard requires "more than a mere possibility" that a defendant's statements "might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (citing *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496, 508 (Cal. Ct. App. 2003). Instead, the standard requires a probability "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.* (citation omitted). The standard is "evaluated from the perspective of 'the ordinary consumer'…who is not typically 'exceptionally acute [or] sophisticated'…" *Souter v. Edgewell Pers. Care Co.*, 2023 WL 5011747, at *1 (9th Cir. Aug. 7, 2023). Product labels should not be "read in the abstract," *Andrade-Heymsfield v. NextFoods, Inc.*, No. 21-cv-1446-BTM-MSB, 2023 WL 2576770, at *3 (S.D. Cal. Mar. 20, 2023), but in the context of the entire packaging messaging.

Here, Plaintiff has alleged that Defendant's Representations are likely to mislead reasonable consumers. Specifically, Plaintiff challenges the following statements: (i) "no

harsh ingredients"; (ii) "elemental chlorine-free rayon"; (iii) "pesticide free"; (iv) "made without fragrance"; (v) "gynecologist tested"; and (vi) "BPA free."  FAC ¶ 81.  Plaintiff alleges that these Representations mislead reasonable consumers who could take those statements to mean that the Products are free from potentially harmful elements and ingredients, including lead.  FAC ¶ 82.

The Court finds that the reasonable consumer could be misled into believing that the Products are free of lead based on the Representations.  In this case, representations like "no harsh ingredients," "gynecologist tested," and "BPA free" are much more conceptually related to the idea that the Products are free from harmful substances, like lead.  *See Sebastian v. Kimberly-Clark Corp.*, No. 17-cv-442-WQH-JMA, 2017 WL 6497675, at *5 (S.D. Cal. Dec. 18, 2017) ("[T]he statements 'simple formula' and 'gentle' are not mere puffery in the context of litigation about alleged misrepresentations regarding the ingredients in baby wipes."); *Trader Joe's*, 2024 WL 1319725, at *1, 8 (defendant's statements about the quality of the products, like "quality ingredients" and "colors derived only from naturally available products," could mislead a reasonable consumer to think that there would be no heavy metals in the products).  In *Equal Exchange*, the court rejected plaintiff's allegation that certain statements on defendant's chocolate products, including "always small farmer grown," would lead consumers to believe that the "Products do not contain unsafe levels of toxins."  2024 WL 1421971, at *5.  While the connection between being locally grown and being free from toxins is attenuated, the connection here between the Representations and the suggestion of the absence of lead is stronger.  *See also Barnes v. Nat. Organics, Inc.*, 2022 WL 4283779, at *6-7 (C.D. Cal. Sept. 13, 2022) (statements like "safe and natural dietary means" were actionable misrepresentations on the presence of heavy metals).  The Court here agrees that a reasonable consumer could be misled into thinking there is no lead in the Products,

24-CV-01337-GPC-KSC

1   based on the Representations about the Products' quality, health, and the absence of

2   certain additives.

3         Whether a business practice is deceptive is usually a question of fact that is not

4   appropriate for determination at the pleadings stage, so "in federal courts, dismissals of

5   UCL, FAL, and CLRA claims at the pleadings stage have 'occasionally been upheld,' but

6   such cases are 'rare.'" *Whiteside*, 108 F.4th, 778 (quoting *Williams*, 552 F.3d at 939).

7   Thus, keeping in mind "the factual inquiry required to adequately assess the merits of the

8   reasonable consumer standard," the Court denies Defendant's motion to dismiss

9   Plaintiff's claims based on affirmative misrepresentations. *Chase*, 2018 WL 786743, at

10  *5.

11        2.  Material omission

12        To support an omission theory, Plaintiff must establish that Defendant had a duty

13  to disclose that the tampons allegedly contain lead.  There are at least two different tests

14  to determine whether a defendant has a duty to disclose.  *See Hammerling v. Google*

15  *LLC*, 615 F. Supp. 3d 1069, 1085 (N.D. Cal. July 18, 2022).   Under one test, the

16  defendant only has a duty when either (1) the defect relates to an unreasonable safety

17  hazard, or (2) the defect is material, "central to the product's function" and the plaintiff

18  alleges one of the four *LiMandri* factors.[1]  *Id.*  Under another approach, "the defendant

19  has a duty any time that a plaintiff alleges one of the following: (1) the defect relates to

20  an unreasonable safety hazard; (2) the defect is material and related to the product's

21  central function; <u>or</u> (3) the presence of one of the four *LiMandri* factors." *Id.* (citation

22  omitted).  Because the Ninth Circuit and a majority of district courts have applied the first

23  _____

24  [1] The *LiMandri* factors are: (1) the defendant is in a fiduciary relationship with the
plaintiff; (2) the defendant had exclusive knowledge of material facts not known to the

25  plaintiff; (3) the defendant actively conceals a material fact from the plaintiff; or (4) the

26  defendant makes partial representations while also suppressing some material facts.

27  *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (Cal. Ct. App. 1997).

28

1  approach, *id.*, this Court will do the same: Plaintiff must allege that the defect relates to

2  an unreasonable safety hazard, or that the defect is material, it is central to the product's

3  function, <u>and</u> at least one *LiMandri* factor is present.

4       In addition to the Rule 9(b) deficiencies regarding the lab testing outlined above,

5  Plaintiff has not sufficiently alleged that the presence of lead amounts to an unreasonable

6  safety hazard.  As Defendant points out, there is no allegation that the tampons even

7  release lead, and the June 2024 study that Plaintiff relies on cautions that future research

8  is needed to "determine whether metals can leach out of tampons and cross the vaginal

9  epithelium into systemic circulation."  Request for Judicial Notice, Ex. 1 at 9.

10  Additionally, the FDA announced in December 2024 that its literature review "did not

11  identify safety concerns associated with tampon use and contaminant exposure."  Notice

12  of Supplemental Authority, Exhibit 1, at 1.  Although none of the studies actually

13  addressed "how much, if any, of the contaminants identified are released from the

14  tampon or absorbed through the vagina," the FDA stated that it "continues to recommend

15  FDA-cleared tampons as a safe option for use as a menstrual product."  *Id.*  In turn,

16  Plaintiff alleges, without other evidence, that lead will be released from the tampons and

17  will "directly enter the bloodstream."  FAC ¶ 11; *see id.* ¶ 33.  However, this contradicts

18  the June 2024 study Plaintiff cites, and the Court "is not required to accept as true

19  conclusory allegations which are contradicted by documents referred to in the

20  complaint."  *Wright v. Oregon Metallurgical Corp*., 360 F.3d 1090, 1096 (9th Cir. 2004).

21       Furthermore, even if the tampons released lead at the levels that Plaintiff has

22  alleged that they do, Plaintiff still fails to allege that the lead is "unreasonably hazardous

23  at the particular levels in the specific Products."  *Trader Joe's*, 2024 WL 1319725, at

24  *11; *Rodriguez v. Mondelez Glob. LLC*, 703 F. Supp. 3d 1191, 1210 (S.D. Cal. 2023),

25  *reconsideration denied*, No. 23-CV-00057-DMS-AHG, 2024 WL 1361892 (S.D. Cal.

26  Mar. 29, 2024) (motion to dismiss fraud-by-omission claims granted because plaintiffs

27

28

24-CV-01337-GPC-KSC

did not plausibly allege defendant concealed an *unreasonable* safety hazard).  In other words, while Plaintiff details the harms posed by lead to human health in general and at the Proposition 65 lead thresholds that trigger notice requirements, the FAC fails to sufficiently allege that these potential harms are "unreasonably hazardous" at the particular levels here.  *Trader Joe's*, 2024 WL 1319725, at *11.

Even under the second approach to determine whether a defendant has a duty to disclose, Plaintiff cannot succeed.  She must sufficiently allege the materiality of the defect, its centrality to the product's function, and the presence of at least one *LiMandri* factor.  While Plaintiff alleges the existence of *LiMandri* factors, *see* Opposition at 19, she does not allege facts for the other prongs.  The Court therefore determines that Plaintiff has not established a duty to disclose upon which her omission theory can stand.

The Court thereby dismisses without prejudice Plaintiff's UCL, FAL, and CLRA omissions claims, and grants Plaintiff leave to amend.

### F. Unfair and unlawful prongs for UCL claim

Defendant argues that Plaintiff fails to state a claim under the UCL's unfair or unlawful prongs.  As to the unfair prong, Defendant argues that it is not met since "Plaintiff does not allege the violation of any independent policy" and did not establish that Defendant's conduct was "substantially injurious, immoral, or unethical."  Mot. at 19.

The UCL prohibits "any [1] unlawful, [2] unfair or [3] fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  The "unfair" prong of the UCL creates a cause of action for a business practice that is unfair even if not proscribed by some other law.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003).  California courts are still divided on which "unfair" standard to apply to consumer suits.  *See Nazemi v. Specialized Loan Serv., LLC*, 637 F. Supp. 3d 856, 864 (C.D. Cal. Oct. 31, 2022) (citing *Graham v. Bank of America, N.A.,* 226 Cal. App. 4th 594, 612 (2014) ("the

23

24-CV-01337-GPC-KSC

appellate courts split regarding the definition of 'unfair' business practices in consumer action"); *Hodsdon v. Mars, Inc*., 891 F.3d 857, 866 (9th Cir. 2018) (internal quotation marks and citations omitted) (proper test for whether an action violates the unfair prong is "currently in flux among California courts").

The Ninth Circuit has identified the following three tests that California courts have considered in addressing the "unfair" prong in a consumer case: "(1) whether the challenged conduct is 'tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law,' [the "Tethering test"][2]; (2) whether the practice is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers,' [the "Immoral test"]; or (3) whether the practice's impact on the victim outweighs "the reasons, justifications and motives of the alleged wrongdoer [the "Balancing test"]." [3] *Doe v. CVS Pharm.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020)[4] (internal citations omitted).

---

[2] The allegations to support the Tethering test of the "unfair" prong may overlap with the "unlawful" prong.  Under these circumstances, "courts may effectively collapse the unlawful prong and the unfair prong, as understood by the public policy test, when the violation of a law is shown.'" *Pemberton v. Nationstar Mort. LLC*, 331 F. Supp. 3d 1018, 1050 n.14 (S.D. Cal. June 26, 2018).

[3] While courts have recognized a fourth test from § 45(a) of the Federal Trade Commission Act ("FTC test") which requires that "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided," *Camacho v. Auto. Club of S. Cal.,* 142 Cal. App. 4th 1394, 1403 (2006), Plaintiff does not allege or rely on the FTC test.

[4] The Court applies *Doe* because it is the most recent Ninth Circuit opinion on the unfair prong of the UCL concerning consumers.  *See Epperson v. Genl Motors, LLC*, -- F. Supp. 3d --, 2023 WL 8628327, at *6 (S.D. Cal. Dec. 13, 2023) (recognizing different approaches adopted by the California courts of appeal as well as the Ninth Circuit and ultimately applying Doe "[g]iven that it is the most recently published Ninth Circuit opinion on the matter").

24-CV-01337-GPC-KSC

Plaintiff alleges that Defendant's conduct is unfair because it omitted disclosures about lead, even though it knew that would be a material omission to consumers, because Defendant had an "improper motive" to financially benefit from its advertising practices. *See* FAC ¶¶ 129-132, 136. Plaintiff also alleges that Defendant's conduct constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws." FAC ¶ 135. The Court finds these allegations are conclusory and insufficient to plausibly allege a UCL claim under the "unfair" prong. The Court grants the motion to dismiss the UCL claim premised on the "unfair" prong.

As to the unlawful prong, Plaintiff alleges that Defendant failed to comply with Proposition 65 and violated Civil Code §§ 1572, 1573, 1709, 1710, 1711 and 1770. *See* FAC ¶¶ 134-138. Plaintiff is entitled to proceed with the UCL under the unlawful prong based upon an alleged violation of the CLRA (Civil Code § 1770).

With respect to Proposition 65, Plaintiff relies on Proposition 65 as a basis for wrongdoing that gives rise to her UCL claim. *See* FAC ¶ 67 ("Although Plaintiff does not bring claims pursuant to Proposition 65, Defendant's violation of Proposition 65 provides a predicate basis for violation of California's Unfair Competition Law…"). However, given the express disavowal of a Proposition 65 claim, relying on it to support a UCL claim would constitute an end run on the procedural requirements contained in Proposition 65 which Plaintiff may not "plead around" by relabeling the nature of the action as one brought under the unfair competition statute. *Rubin v. Green*, 4 Cal. 4th 1187, 1201 (1993).[5] Accordingly, the Court grants the motion to dismiss the UCL claim

---

[5] In its opposition, Plaintiff relies on *Brannon v. Barlean's Organic Oils, LLC*, No. 3-18-CV-01619-BTM-MDD, 2019 WL 4393653, at *3 (S.D. Cal. Sept. 12, 2019), to support its position that Proposition 65 can be relied on as a predicate violation to support a UCL claim. However, in *Brannon*, the defendant did not challenge Proposition 65 as a predicate violation and merely claimed it had complied with Proposition 65 notices.

24-CV-01337-GPC-KSC

1    premised on a violation of Proposition 65 and denies the motion as to the alleged CLRA

2    violation.[6]

3    **G. Equitable claims**

4      1. *Sonner*

5      Plaintiff seeks restitution and injunctive relief under the UCL, FAC ¶¶ 142, 144;

6    restitution, disgorgement, and injunctive relief under the FAL, FAC ¶¶ 154-55; and

7    damages and injunctive relief under the CLRA, FAC ¶¶ 175-76.  Defendant moves to

8    dismiss the equitable claims under the UCL, FAL, and the CLRA, arguing that Plaintiff

9    has not alleged an inadequate remedy at law, based on *Sonner v. Premier Nutrition Corp*.,

10   971 F.3d 834 (9th Cir. 2020).  Mot. at 20.  Plaintiff opposes, arguing that she can plead

11   equitable relief in the alternative, citing to several post-*Sonner* district court cases.  *See*

12   Opposition at 21-22.

13     In *Sonner*, the Ninth Circuit held that "traditional principles governing equitable

14   remedies in federal courts, including the requisite inadequacy of legal remedies, apply

15   when a party requests restitution under the UCL and CLRA in a diversity action."  971

16   F.3d at 844.  There, the consumer conceded that she sought "the same sum in equitable

17   restitution as 'a full refund of the purchase price'—$32,000,00—as she requested in

18   damages to compensate her for the same past harm." *Id*.  Accordingly, the court held that

19   a plaintiff must allege that she "lacks an adequate remedy at law before securing

20   equitable restitution for past harm under the UCL and CLRA."  *Id*.; *see*, *O'Shea v.*

21   *Littleton*, 414 U.S. 488, 502 (1974) (dismissing complaint that failed to establish the

22   basic requisites for the issuance of equitable relief).

23

24   ───────────────

25   [6] While the remaining claims in the Complaint are *not* entirely derivative of the unspoken

26   Proposition 65 violation and therefore not subject to Proposition 65 notice requirements,

     *see infra*, section H, that is a separate question from whether Plaintiff can premise the

27   "unlawful" prong on a Proposition 65 violation for a UCL claim.

28                                                                                    24-CV-01337-GPC-KSC

1   District courts have held that this requirement to plead "inadequacy-of-law"

2   applies to equitable relief beyond restitution, including for injunctive relief claims.  *Shay*

3   *v. Apple Inc.*, 2021 WL 1733385, at *3 (S.D. Cal. May 3, 2021) (collecting cases).

4   District courts, however, are far less in agreement on *Sonner*'s application to the pleading

5   stage.  There is currently an "intra-circuit split" on whether courts may allow UCL claims

6   to proceed past pleading when other adequate remedies exist and on how "exacting of a

7   standard *Sonner* imposes on plaintiffs who plead claims for equitable and legal claims at

8   the pleading stage."  *Jeong v. Nexo Fin. LLC*, 2022 WL 174236, at *27 (N.D. Cal. Jan.

9   19, 2022) (citing *Byton N. Am. Co. v. Breitfeld*, 2020 WL 3802700, at *9 (C.D. Cal. Apr.

10  28, 2020)).

11          A number of district courts have concluded that *Sonner* does not preclude a

12  plaintiff, at this stage, from pleading equitable remedies in the alternative.  *See Nacarino*

13  *v. Chobani, LLC*, 668 F. Supp. 3d 881, 895-97 (N.D. Cal. 2022) (denying dismissal of

14  restitution claim, even if it "may be revisited at a later stage"); *accord Yeomans v. World*

15  *Fin. Grp. Ins. Agency, Inc*., 2022 WL 844152 (N.D. Cal. Mar. 22, 2022).  Because

16  *Sonner* was decided at a later posture, it does not directly address what exactly a plaintiff

17  must allege at the pleading stage.  *See also Carroll v. Myriad Genetics, Inc*., 2022 WL

18  16860013, at *6 (N.D. Cal., Nov. 9, 2022) ("This Court will not deprive plaintiffs of their

19  claims without clearer direction from a higher court.").  Allowing claims to move forward

20  would also be consistent with Federal Rule of Civil Procedure 8, which allows for

21  pleading in the alternative.  Fed. R. Civ. P. 8(a)(3) (a claim for relief must contain "a

22  demand for relief sought, which may include relief in the alternative or different types of

23  relief"); *see also Byton*, 2020 WL 3802700, at *9 ("[T]he Ninth Circuit's general rule is

24  that plaintiffs may plead alternative claims, even if those claims are inconsistent.").

25          That being said, Plaintiff here pleads <u>no</u> allegations that the legal remedies are

26  inadequate for the restitution or disgorgement that she seeks under the UCL and FAL.

This warrants dismissal of those claims to the extent she seeks restitution and/or disgorgement. *See Scheibe v. Performance Enhancing Supplements, LLC*, 2024 WL 5444644, at *5 (S.D. Cal. Aug. 23, 2023) (allowing CLRA damages claim to move forward while dismissing CLRA equitable relief claim because the complaint lacked any mention of inadequate legal remedies).

At a minimum, Plaintiff must plead inadequate legal remedies in the operative pleading to allege claims for equitable relief under the UCL, FAL, and CLRA. She has shown this for the injunctive relief that she seeks. *See* FAC ¶¶ 109-112. But because Plaintiff has not alleged that legal remedies are inadequate for the disgorgement and restitution remedies under the UCL and FAL, the Court grants the Defendant's motion to dismiss the UCL and FAL claims to the extent she seeks these forms of relief. The Court grants Plaintiff leave to amend the complaint to expressly allege facts to support a claim that her remedies at law are inadequate.

2. Standing for injunctive relief

The Ninth Circuit in *Davidson v. Kimberly-Clark*, 889 F.3d 956 (9th Cir. 2018), held that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm." *Davidson*, 889 F.3d at 969 (citing *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009)). "Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." *Id.* If plaintiffs can establish that they will be unable to rely on the product's advertising or labeling in the future, so will not purchase the product even if they want to; or that they might purchase the product in the future, because they may reasonably but incorrectly assume the product has changed, then plaintiffs can establish a future injury. *See id.* at 969-70.

1    Defendant argues that Plaintiff still does not have standing for her injunctive relief

2    claims because this Court and others in the Circuit have held that courts "cannot impose a

3    mandatory injunction requiring a company to alter its products."  Mot. at 21 (quoting

4    *Renn v. Otay Lakes Brewery, LLC*, 2024 WL 331616, at *8 (S.D. Cal. Jan. 29, 2024)).

5    Defendant interprets Plaintiff's statement that she would "like to purchase the Products in

6    the future if the Products do not contain lead," FAC ¶ 109, to mean that Plaintiff is (only)

7    asking for an injunction that would force Defendant to reformulate its Products to not

8    contain lead.  Mot. at 21.

9    However, if the Court is construing the complaint in the light most favorable to the

10   Plaintiff, it is clear that the FAC gives rise to more than just this "one plausible injunctive

11   remedy."  Opposition at 24.  Plaintiff certainly will not buy the Products if they contain

12   lead, but the key point – and the injury for standing – is that Plaintiff *won't know* if the

13   Products contain lead or not without an injunction of some kind.  *See* FAC ¶¶ 110-111.

14   Plaintiff allege that she is "not able to rely on the labeling and advertising of the products

15   for their truth, and thus is unable to determine whether she can purchase the Products in

16   the future," even though she would like to purchase them.  *Id*. ¶¶ 110; *see Davidson*, 889

17   F.3d at 971-72 (plaintiffs face injury when they are "unable to rely on [Defendant's]

18   representation of its products in deciding whether or not [they] should purchase the

19   product in the future").  Several forms of injunctive relief could redress this injury.  In the

20   Complaint itself, the form of injunctive relief most directly alluded to is "enjoin[ing]

21   [Defendant] from failing to disclose the presence of lead"; in other words, enjoining

22   Defendant to disclose, on its advertising or labeling of its Products, whether there is lead

23   or not.  FAC ¶¶ 144, 159.  Plaintiff does not seek – or does not *only* seek – an injunction

24   that would mandate Defendant to change the content of its Products.

25   Plaintiff's allegation that she will have no idea of determining whether the

26   Products contain lead or not constitutes a "threatened injury certainly impending," and

27

28

24-CV-01337-GPC-KSC

1  thereby establishes standing for her injunctive relief claims.  *See Davidson*, 889 F.3d at

2  972.

3    **H. Proposition 65**

4    Defendant argues that the Complaint is a "disguised effort to press claims under

5  Proposition 65."  Mot. at 22 (citing *Rodriguez v. Equal Exchange, Inc*., 2024 WL

6  1421971, at *3 (S.D. Cal. Mar. 31, 2024)).  Under Proposition 65, no person doing

7  business shall "knowingly and intentionally expose any individual to a chemical known

8  to the state to cause cancer or reproductive toxicity without first giving clear and

9  reasonable warning to such individual" where the amount exceeds the "no significant risk

10  level" established by the California Environmental Protection Agency's Office of

11  Environmental Health Hazard Assessment.  *Sciortino*, 108 F. Supp. 3d at 787 (citing Cal.

12  Health & Saf. Code Sections 25249.6).

13    Private parties may sue to enforce Proposition 65, but the plaintiff must first wait

14  60 days after she gives "notice of an alleged violation" to the "alleged violator," the

15  California Attorney General, and local prosecutors.  Cal. Health & Saf. Code Section

16  25249.7(d).  Pursuant to an amendment that took effect in 2002, the notice must also

17  include a "certificate of merit" that states that the "person executing the certificate has

18  consulted with one or more persons with relevant and appropriate experience or

19  expertise… and that, based on that information, the person executing the certificate

20  believes there is a reasonable and meritorious case for the private action."  *See Sciortino*,

21  108 F. Supp. 3d at 788 (citing *DiPirro v. Am. Isuzu Motors, Inc*., 119 Cal. App. 4th 966,

22  970 (Cal. Ct. App. 2004); Cal. Health & Saf. Code Section 25249.7(d)(1)).

23    The policy behind these pre-suit requirements is to encourage public enforcement

24  and settlement, and to deter frivolous private lawsuits.  *See Sciortino*, 108 F. Supp. 3d at

25  788 (detailing the policy justifications behind Proposition 65's pre-suit requirements).  To

26  that end, California courts strictly enforce the notice requirements and hold that pre-filing

27

28

24-CV-01337-GPC-KSC

notice is mandatory, and that defective notice cannot be cured retroactively. *Id.* (discussing *DiPiro* and *In re Vaccine Cases*, 134 Cal. App. 4th 438 (Cal Ct. App. 2005)). The courts in *DiPiro and In re Vaccine Cases* dismissed the complaints with prejudice because allowing retroactive cure "would reduce the effectiveness of prelitigation efforts by the Attorney General to discourage filing the frivolous suit in the first place." *Id.* (citation omitted).

These pre-suit requirements apply not only to actions explicitly brought under Proposition 65, but to "camouflaged suits" that enforce Proposition 65's strictures under other laws. *Rodriguez*, 2024 WL 1421971, at *2. In other words, a plaintiff cannot skirt these requirements by bringing claims – under consumer protection statutes – that would otherwise "be barred under Proposition 65." *Cel-Tech Comm'ns v. Los Angeles Cellular Tel. Co.*, 973 F.2d 527, 541 (Cal. 1999). The key question for the Court then becomes whether the claims asserted in the Complaint are "entirely derivative of an unspoken Proposition 65 violation, or whether they assert claims independent of Proposition 65." *Harris v. RJ Reynolds*, 2016 WL 6246415, at *2 (N.D. Cal Sept. 30, 2016) (citing *Sciortino*, 108 F.Supp. 3d at 792).

Here, the claims in the Complaint are *not* entirely derivative of the unspoken Proposition 65 violation (failure-to-warn of lead). However, Plaintiff does not merely allege that there was a failure to warn under Proposition 65. Instead, she alleges that Defendant "has gone beyond the offenses of omission that Proposition 65 seeks to prevent and has affirmatively deceived its customers." *Equal Exchange*, 2024 WL 1421971 at *4. Plaintiff asserts that Defendant has actively misled consumers by making Representations on Products that belie the presence of lead. Since this goes beyond a failure-to-warn violation under Proposition 65, the Court finds that the Plaintiff asserts claims independent of Proposition 65 and are not subject to the notice requirements.

24-CV-01337-GPC-KSC

1    *Sciortino* is instructive.  There, the two named plaintiffs asserted claims under the

2    CLRA, UCL, and FAL.  Plaintiff Ibusuki alleged that the defendant Pepsi failed to warn

3    consumers that its product had a Proposition 65-listed chemical.  The court found that his

4    claims rose "exclusively from his allegations that Pepsi did not issue the warning

5    required by Proposition 65," and dismissed his claims.  *Sciortino*, 108 F.Supp. 3d at 794.

6    By contrast, the court found that plaintiff Hall's complaint was "based not literally upon a

7    violation of Proposition 65, but on Pepsi's public statements which allegedly

8    misrepresented its actions."  *Id*.  It was not fatal that the Hall complaint referred to

9    Proposition 65 "repeatedly in support of [plaintiff's] claims," including "as part of her

10   allegations for the predicate wrong in support of her state law claims."  *Id*. at 793-94

11   (citations to complaint omitted).  Instead, the court found that "[w]hile the alleged

12   misstatement is *related* to Proposition 65, the alleged wrong is not a failure to warn under

13   Proposition 65, but rather a *separate* misrepresentation to consumers…"  *Id*. (emphasis

14   added).

15        Likewise, the alleged wrong here is not simply a failure-to-warn of lead, but a

16   misrepresentation of the Products, given statements like "elemental chlorine-free rayon,"

17   "pesticide free," "gynecologist tested," and BPA free."  According to Plaintiff, "The

18   Representations lead reasonable consumers to believe that the Products are safe to use…

19   The Representations are misleading based on the lead contained in the Products."  FAC

20   ¶¶ 82, 83.  Because "[a]llegations of misleading statements and affirmative

21   misrepresentations fall outside Proposition 65's ambit," Plaintiff may proceed with her

22   consumer protection claims, notwithstanding the Proposition 65 notice requirements.

23   *Equal Exchange*, 2024 WL 1421971 at *4 (internal quotations omitted).

**CONCLUSION**

24

25

26

27

28

24-CV-01337-GPC-KSC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Based on the reasoning above, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss.  The Court GRANTS Plaintiff leave to amend and DIRECTS Plaintiff to file a second amended complaint within 25 days of this order.

**IT IS SO ORDERED.**

Dated:  February 13, 2025

Hon. Gonzalo P. Curiel
United States District Judge

33

24-CV-01337-GPC-KSC